UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

BRANDI RUSSELL, ET AL                    CIVIL ACTION NO. 10-cv-0150

VERSUS

JERRY GOODWIN, ET AL                     MAGISTRATE JUDGE HORNSBY

**MEMORANDUM RULING**

**Introduction**

Brandi Russell and Janet Benson are former employees at the David Wade Correctional Center.  The women allege that they were sexually assaulted by Curt Wainwright, a superior officer.  Their Amended Complaint (Doc. 6) asserts (1) Title VII claims of hostile work environment and retaliation against their former employer, the State of Louisiana; (2) counts under 42 U.S.C. § 1983 and state law against Warden Jerry Goodwin, Deputy Warden Ray Hanson, Col. Lonnie Nail, Col. Jackie Hamil, and Capt. Morris Hickman; and (3) counts under Section 1983 and state law against Wainwright.

Plaintiffs filed a Motion for Partial Summary Judgment (Doc. 47) on their Title VII claim against the State and against Capt. Hickman based on his alleged failure to report a prior incident where Wainwright harassed another female employee.  At about the same time, all defendants except Wainwright joined in a Motion for Summary Judgment (Doc. 45). They seek dismissal of the Title VII claim based on a Faragher/Ellerth defense and dismissal of

the Title VII retaliation claims. Defendants' motion does not directly attack the Section 1983 claims against the individual supervisors.

**Summary Judgment Standard**

Under Fed.R.Civ.P. 56(a), the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it might affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 106 S.Ct. 2505, 2510 (1986). A dispute is "genuine" if there is sufficient evidence so that a reasonable jury could return a verdict for either party. Anderson, supra; B & A Pipeline Co. v. Dorney, 904 F.2d 996, 1002 (5th Cir. 1990).

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion, and identifying those parts of the record that it believes demonstrate the absence of genuine issue of material fact. Celotex Corp. v. Catrett, 106 S.Ct. 2548 (1986). If the moving party carries his initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of a genuine dispute of a material fact. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 106 S.Ct. 1348, 1355-56 (1986).

**Key Facts**

**A.  Introduction**

The parties have submitted evidence, both in support of their motions and in their oppositions.  They often incorporate by reference materials and arguments made in the

related memoranda.  All parties have had the opportunity to be fully heard with respect to all of the competing evidence.  Accordingly, the court will draw facts from the entire summary judgment record as it assesses the motions. There may be some evidence in the record that is contrary to the facts set forth below, but any conflicts must be resolved in favor of Plaintiffs for summary judgment purposes.

### B.  Janet Benson

Janet Benson submitted an affidavit in support of the Plaintiffs' motion (Doc. 47, Exhibit E) and as part of her opposition (Doc. 61, Exhibit E) to Defendants' motion.  Benson testifies that she began working at the prison in 1999 as a corrections officer.  By February 2009, Benson was a lieutenant with a duty station in the East Walk gate.  Curtis Wainwright held the superior rank of major.

Benson bases her claim of sexual harassment on a single incident from February 2009, but she alleges that Wainwright earlier made comments to her such as, "Why wouldn't you marry me?"  She also testifies that Wainwright "rubbed his hand down her back in a sexual manner."  Benson testifies that she did not report those comments and actions because she did not believe they were sexual harassment, she was embarrassed, she did not want to cause problems in her marriage, and she did not think she would be taken seriously.

Benson testifies about the February 2009 incident, which triggered this lawsuit, as follows:

> On the day in question, there was a ground shakedown. Lt. Benson went to get the metal detector down.  Benson got it down from the shakedown room.

> While walking to the shakedown room door to exit, Wainwright came up
> behind Mrs. Janet Benson and reached from behind her between her legs and
> grabbed Mrs. Benson in her private area so hard that he almost picked her up
> off the floor.  Ms. Benson, stepped away from him, swung her hand toward his
> hand, turned around and told him to stop.  He replied, 'oh I like that'.

Benson testifies that the contact was unwelcome and came suddenly and without warning.

It took only seconds to transpire.  Benson says that she did not report the assault because she

was embarrassed, Wainwright was a superior officer, she feared retaliation, she did not want

to cause a problem in her marriage, and she thought she would not be believed or taken

seriously.

### C.  Brandi Russell

Brandi Russell filed in support of the Plaintiffs' motion an unsworn declaration

pursuant to 28 U.S.C. § 1746.  Doc. 49, Exhibit F.  She attached a copy of the same

declaration to her opposition to Defendants' motion.  Ms. Russell states that she began

working as a corrections officer at the prison in 2006, and by 2009, was a sergeant assigned

to the laundry room.  Her shift commander was Major Curt Wainwright, with whom she was

in contact on a regular basis.  Ms. Russell testifies that in February 2009 Wainwright told her

that her haircut turned him on, to which she replied, "Don't say those kind of things to me."

In March, Wainwright "brushed against her butt," but Russell thought it was an accident and

ignored it.

Ms. Russell's last task of the day was usually to report the number of inmate

shakedowns to the shift commander.  After she gave her report to Wainwright one evening

in April 2009, Wainwright initiated contact that forms the basis of this suit.  Ms. Russell testifies that Wainwright had "initiated hugs before," but she had never said or done anything to indicate to him that she wished anything but a professional relationship.  Ms. Russell's declaration describes the April event as follows:

> Curt Wainwright initiated a hug of her, but then without her consent he attempted to kiss Russell-Garrett.  She moved her head to avoid the kiss. Wainwright forcibly grabbed Ms. Russell on the crotch.  He also grabbed her hand or wrist and made her touch him on his private area, all without her consent.  She pulled away from Wainwright immediately.  She was shocked. Wainwright's conduct was offensive and humiliating.  She left the building immediately, left DWCC and drove away; she was extremely upset.

Ms. Russell adds that Wainwright "touched her private area through her clothes and he caused her hand to come into contact with his genitals through his clothes" during the unwelcome and unexpected contact.

**D.  The Investigation**

Ms. Russell reported the event that same evening to Col. Lonnie Nail, who promptly contacted Asst. Warden Ray Hanson, who in turn contacted Warden Jerry Goodwin.  The Warden asked that Ms. Russell be asked to report back to the prison that evening so an investigation could be initiated.  Russell did so and repeated her allegations.  Wainwright denied that there had been any physical contact but, if so, it was inadvertent and unintentional.  Warden Goodwin immediately placed Wainwright on leave until further notice. The Warden then requested investigative support from Headquarters, and the request was granted.  Col. Eric Sivula, Sr. conducted the investigation, which included polygraph

exams of Russell (with indications of truthfulness) and Wainwright (with indications of dishonesty).

Sgt. Synthia Fultz, who is not a party to this suit, came forward early in the investigation and alleged in a written statement that Wainwright had kissed her and groped her between the legs sometime late in the summer of 2008. Fultz also alleged in a recorded interview that Wainwright had often talked about how much he enjoyed performing oral sex on women.

Janet Benson testifies that she heard in April 2009 that Wainwright was not at work anymore because of an alleged sexual incident. She then called Col. Earl Benson (her husband's uncle) and reported her February incident with Wainwright. Ms. Benson testifies that Col. Benson told her this was not the first time someone had reported a sexual type incident about Wainwright. Ms. Benson provided a written statement as part of Col. Sivula's investigation.

Col. Sivula wrote in his report that Wainwright admitted to having been counseled at least once regarding his conduct toward female employees. Wainwright eventually conceded that he had touched female employees without their consent, but he denied any wrongdoing or touching of the genital or pelvic area of himself or the three female officers. Sivula found that Wainwright did inappropriately touch three female employees without their permission or consent and engaged in language or conversations of an explicit sexual nature in the presence of employees.

After the Sivula report issued, Warden Goodwin wrote Wainwright and informed him that he would be dismissed from his job, subject to a right to appeal to the Civil Service Commission.  Plaintiffs report that the appeal was denied, but Wainwright chose to retire instead of being fired.  A Claiborne Parish grand jury indicted Wainwright on three counts of sexual battery.  Those charges were pending at the time the motions were briefed.

**Title VII Claim**

Title VII forbids an employer to discriminate against an employee with respect to her compensation, terms, conditions, or privileges of employment, because of the employee's sex. The first question in assessing a Title VII claim of sexual harassment is whether the suit is classified as a quid pro quo case or a hostile environment case.  Casiano v. AT&T Corporation, 213 F.3d 278, 283 (5th Cir. 2000).  Plaintiffs do not contend that either of them has a quid pro quo case, and their briefs are devoted to the hostile environment theory.

The standards for determining whether an employer is liable for a hostile work environment depends on whether the person who allegedly created that environment is properly characterized as the plaintiff's supervisor or co-worker.  If the harasser was a supervisor with immediate (or successively higher) authority over the employee harassed, the employer is vicariously liable to the victimized employee, subject to the affirmative defense set forth in Burlington Ind. v. Ellerth, 118 S.Ct. 2257 (1998) and Faragher v. City of Boca Ratan, 118 S.Ct. 2275 (1998).  If the harasser is a mere co-worker, the employer will not be liable for the harassment unless the plaintiff proves the employer knew or should have known

of the harassment and failed to take prompt remedial action.  Watts v. Kroger Co., 170 F.3d 505, 509 (5th Cir. 1999).

Plaintiffs argued in their motion that Wainwright was their supervisor.  Defendants' opposition argued that Wainwright had some, but not primary, authority over Plaintiffs, which Defendants say means Wainwright was not necessarily the Plaintiffs' supervisor for Title VII purposes.  (Defendants did not suggest a legal standard by which supervisor status should be measured.)  But when Defendants filed their motion for summary judgment, they analyzed the Title VII claim as one for supervisor sexual harassment, with no contention that Wainwright was a mere co-worker.

Title VII does not define a supervisor, and the courts are divided on the proper standard. Some take the narrow view that to qualify as a supervisor the person must exercise significant control over the plaintiff's terms or conditions of employment, such as having the ability to hire, fire, demote, or reassign with significantly different responsibilities.  Other courts, and the EEOC, take a broader view that persons who have the power to direct on-the-job activities also qualify as supervisors.  Some also acknowledge that the employer can be liable if the victim reasonably believed that the harasser had supervisory power.  See, e.g., Merrick T. Rossein, Who is a Supervisor?, 1 Employment Discrimination Law and Litigation, Section 5:8; 18 No. 26 Andrews Employment Litigation Reporter 12 (July 20, 2004) (Courts Split on Definition of 'Supervisor' in Sexual Harassment Cases); and Who Is a "Supervisor" for Purposes of Sexual Harassment Claim under Title VII, 195 ALR Fed. 463

(2004).  The parties have not directed the court to a Fifth Circuit case that has staked out a firm position on this issue.

It appears that Wainwright was Ms. Russell's direct supervisor in some fashion, as she reported to him after the shakedown.  Wainwright's authority with respect to Benson is less clear.  We know that Wainwright was a superior ranking officer, but courts have declined to decide such matters based on mere rank, seniority, or placement on a management chart.  The actual or apparent authority of the harasser, with respect to the victim, is examined.  Wainwright, at his deposition, described himself as a "supervisor" over both Plaintiffs, but his actual authority over them is not described in any detail.  It does appear that he was the shift supervisor over Ms. Russell, but it is not stated whether he had any supervisory duties in connection with Ms. Benson other than being of a superior rank.  Wainwright said that, as a shift supervisor, he could initiate discipline by writing a violation report and turning it over to a colonel, which could ultimately lead to discharge.   When asked about his responsibility as far as a person's pay and merit increases, Wainwright said he could put in a request to deny a merit increase but could not stop it.  He could grant leave and approve vacations for employees on the shift, and could authorize some transfers of assignments among the 28 employees on his shift.  Presumably Ms. Russell was included in that number, but Wainwright's attorney objected to a suggestion that he supervised the laundry room, so even that is not clear.

Given the lack of clarity in the relevant law and facts surrounding this issue, the court cannot say as a matter of law at this time whether Wainwright was a supervisor or a mere co-worker of either plaintiff.   Unless the parties can agree to a stipulation regarding Wainwright's supervisor status with respect to each plaintiff, they must be prepared to propose and defend jury instructions on the issue.   They will also need to develop the relevant facts at trial.

Plaintiffs next argue is that there is no genuine dispute that Wainwright "sexually assaulted" them.   Plaintiffs base this argument on the findings in the Sivula report, which they argue is admissible in evidence and estops the State from taking a contrary position. Whether the report and related documents are admissible is an issue that will be decided later in the trial or pretrial proceedings.   As for estoppel, the report makes findings that Wainwright "inappropriately touched three female DWCC employees without their permission or consent" and "engaged in language or conversations of an explicit sexual nature while at work and in the presence of DWCC employees." This report might make it difficult for the State to deny Wainwright engaged in inappropriate conduct, and they have not done so in the briefing of the motions, but it does not provide a legal basis for the court to now declare that Wainwright sexually assaulted both Plaintiffs.   The request for a declaration on this basis is denied. It is sufficient for the sake of analyzing the motions to note that there is uncontested testimony from Plaintiffs of unwanted contact of a kind that

may give rise to a hostile environment claim. Whether the contact rose to that level is the next issue.

Plaintiffs next ask for a finding that the sexual assaults they describe, if accepted as true, are actionable under Title VII.  "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment'."  Harvill v. Westward Communications, LLC, 433 F.3d 428, 434 (5th Cir. 2005), quoting Meritor Sav. Bank, FSB v. Vinson, 106 S.Ct. 2399 (1986).  Courts look at the totality of the circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work or performance.  The challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so. Harvill, 433 F.3d at 434.  The deliberate and unwanted touching of intimate body parts is one of the most severe forms of sexual harassment.  Harvill, 433 F.3d at 436. Even a single incident of such contact may constitute severe harassment. See Cherry v. Coastal, Inc., __ F.3rd __ 2012 WL 147867, *4 (5th Cir. 2012).

Defendants argue that the assaults described by Plaintiffs might not be actionable because neither Plaintiff can present evidence that she sustained a significant psychological injury due to the harassment.  Defendants cite a 1986 Fifth Circuit case for the proposition that such injury is required, but the Supreme Court has made clear that there is no such

requirement. <u>Harris v. Forklift Sys., Inc.</u>, 114 S.Ct. 367, 371 (1993) ("So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive, there is no need for it also to be psychologically injurious.") <u>See also</u>  <u>Griffin v. Delchamps, Inc.</u>, 176 F.3d 480, n. 9 (5th Cir. 1999) (unpublished). Plaintiffs have presented evidence sufficient to allow the summary judgment assessment to proceed to the next step in the analysis.

**<u>Ellerth</u>/<u>Faragher</u> Defense**

If either Plaintiff establishes that Wainwright was her supervisor and created a hostile environment, the State is vicariously liable under Title VII unless the State can prove both prongs of the <u>Ellerth</u>/<u>Faragher</u> affirmative defense, which is (1) the State exercised reasonable care to prevent and correct promptly any such sexual harassment, and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the State or to avoid harm otherwise.  <u>Casiano</u>, 213 F.3d at 284.  If Wainwright was a co-worker but not a supervisor, the State will not be liable for his harassment unless the State knew or should have known of the harassment and failed to take prompt remedial action.  <u>Watts v. Kroger Co.</u>, 170 F.3d at 509.

The State argues that it is entitled to summary judgment on the Title VII claim because it has established this defense. Plaintiffs ask for summary judgment in their favor holding the defense is unviable.  Defendants point to their sexual harassment policy and instructions. They note that Ms. Benson did not report her alleged harassment until several weeks after

it happened, and when Ms. Russell reported her alleged harassment there was immediate action taken by the employer that prevented any further harassment.

Plaintiffs respond that the rules are different when there is "sudden sexual harassment" such as a single attack rather than ongoing misbehavior that can be stopped by complaining to management. See, e.g., Walton v. Johnson & Johnson Services, Inc., 347 F.3rd 1272, 1291-92 (11th Cir. 2003) (collecting cases but not addressing the issue); and Greene v. Dalton, 164 F.3rd 671, 675 (D.C. Cir. 1999) (summary judgment on the defense inappropriate when supervisor raped the employee, in absence of evidence a reasonable person in the victim's place would have come forward early enough to prevent the harassment from becoming severe or pervasive); and Indest v. Freeman Decorating, Inc., 168 F.3d 795, 804 n. 52 (5th Cir. 1999) (Wiener, J., concurring).[1]

The argument is that the employee cannot be said to have "unreasonably failed" to take advantage of available procedures to prevent the harassment when the supervisor attacks her without warning. Plaintiffs also offer evidence that prison officials may have known that Wainwright had engaged in sexual harassment of other women before these events and that prison officials said and did a number of things to suggest that they were not as serious about

---

[1] "It is, of course, theoretically possible for a supervisor to engage in sufficiently severe conduct (e.g., raping, 'flashing,' or forcibly groping or disrobing the subordinate employee) in such a short period of time that, even though (1) the employee reports the conduct immediately, (2) the employer takes swift and decisive remedial action, and (3) no tangible employment action ensues, the employer could still be held vicariously liable under the Ellerth / Faragher 'severe or pervasive' test."

preventing sexual harassment as their written policy indicates. The court finds that summary judgment is not warranted for either party with respect to the Ellerth/Faragher affirmative defense.

**Hickman: Duty to Report**

The Sixth Cause of Action in Plaintiffs' Amended Complaint asserts a state law claim of negligence against Captain Morris Hickman and four supervisors.  Plaintiffs allege that the supervisors and Hickman "negligently failed to report or act upon prior instances of Wainwright's sexually abusive conduct on many occasions."  ¶ 68.  They allege that Hickman owed a duty of care to report instances of sexual harassment, that Hickman was disciplined for failing to report such instances, and that other officers had similar knowledge of the history of sexually abusive behavior by Wainwright.  ¶¶ 69-70.

Plaintiffs, in the proposed order that accompanies their Motion for Partial Summary Judgment, ask for a finding that Captain Hickman had a duty to report to his superiors his knowledge of an incident between Sgt. Fultz and Wainwright.  Their memorandum devotes only two paragraphs to the issue and cites no Louisiana jurisprudence that has recognized a duty in similar circumstances.  Plaintiffs cite DOC rules, but there are factual disputes as to whether those rules required a report in this case, and a violation of an employer's rules or policy is not automatically equivalent to a tort under state law.

Whether a duty is owed, under Louisiana tort law, is a question of law.  The court must make a policy decision in light of the facts and circumstances presented.  The inquiry

is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed her a duty.  Lemann v. Essen Lane Daiquiris, Inc., 923 So.2d 627, 633 (La. 2006). Assuming there is a duty, there must then also be a breach of that duty, the substandard conduct must be a cause in fact and a legal cause of the plaintiff's injuries, and there must be damages.  Lemann, 923 So.2d at 633.

Plaintiffs do not articulate the theory of their claim, but Defendants presume that the argument is that if Hickman had reported Ms. Fultz's complaints about Wainwright, then Wainwright would have been stopped before he could assault Plaintiffs.  Defendants point to facts that create questions about whether Hickman was obligated under the DOC rules to make such a report.

Plaintiffs have not persuaded the court that Hickman had a duty exactly matching the DOC policies.  The court might allow a jury instruction that Hickman had a duty to report to his superiors information made known to him about sexual harassment in the workplace if a reasonable person, considering all of the circumstances, would have believed it was likely that the victim of the harassment or other employees would be subjected to continued or additional harassment if the information was not reported.  If Plaintiffs propose a similar charge when the time for jury instructions arrives, they must also propose charges for causation and the other elements of such a claim.  If Plaintiffs elect to press such a claim at trial, they should do so with their eyes wide open to the reasonable argument made by Defendants that Ms. Russell has a strong claim under this theory against her co-Plaintiff

Benson, who failed to report similar sexual harassment only weeks before Russell was allegedly attacked.

**Retaliation**

> **A. Introduction**

Plaintiffs' Fourth Cause of Action is labeled Section 1983 retaliation and alleges facts in an effort to make out such a claim.  Their Seventh Cause of Action is labeled Title VII Sexual Harassment and Retaliation (against the State), but it adds no facts to support a retaliation claim. Defendants ask for summary judgment on the retaliation claims, which they brief in accordance with Title VII law.

To establish a Section 1983 retaliation claim for the exercise of First Amendment rights or a Title VII retaliation claim, a plaintiff must prove, among other elements, that she suffered an adverse employment decision.  Juarez v. Aguilar, --- F.3d ----, 2011 WL 6443711, *3 (5th Cir. 2011); McCoy v. City of Shreveport, 492 F.3d 551, 556 (5th Cir. 2007).   The Fifth Circuit once held that adverse employment decisions, in the Title VII setting, were limited to "ultimate employment decisions" such as hiring, firing, promoting, or cutting pay. The Supreme Court recently overturned that rule, when it held in a Title VII case that actionable retaliation is not limited to ultimate employment decisions. Rather, the plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which means it well might have dissuaded a reasonable worker from engaging in the protected conduct.  Burlington Northern & Santa Fe Railway Co. v. White, 126 S.Ct. 2405

(2006).   Unless directed to contrary authority, this court will assume that the scope of actionable conduct for Section 1983 retaliation purposes is at least as broad as the scope of employer activities that are actionable under Title VII.  See Laredo Fraternal Order of Police v. City of Laredo, 2008 WL 678698, *2 (S.D. Tex. 2008) and Rodriguez v. City of Laredo, 2007 WL 2329860, *3 (S.D. Tex. 2007).  Defendants employ the Burlington standard in their briefing, so there does not appear to be any disagreement on this point.

**B. Benson's Claims**

Ms. Benson alleged in the Amended Complaint that she was reassigned temporarily to "lower job duties" that are not normally assigned to persons of her rank, and that the action was taken to discourage the constitutionally protected activity of complaining of constitutional violations.  ¶¶ 60-61.  Defendants' attack on the claim consists of the following argument: "Ms. Benson's complaint centers around her being sent to a tower, a job she stated was to punish her.  However, the evidence does not establish that this assignment was considered a punishment."   The only evidence cited by Defendants in support of this contention is testimony from Sgt. Fultz, who testified that her favorite work assignment at the prison was Tower 4 because you were by yourself and had no one to bother you.  She liked Tower 2 as well, but it was lower to the ground, and work on the tier was her least favorite because there was so much work to do.  Ms. Benson, in response, testified that "beginning around August 17, 2009," Major Rawson put her "on tower duty for that night."  She added that tower duty is normally reserved for sergeants or cadets; a lieutenant is not typically placed on tower duty

because there is no opportunity for supervision of other officers.  Benson testifies that Rawson, when asked about the reassignment, gave no reason and ordered Benson to the tower.  The affidavit is not clear as to whether this was a one-night assignment or continued.

Benson's complaint directs her Section 1983 retaliation claim against Warden Goodwin, Deputy Warden Hanson and Col. Hamil.  None of them are mentioned in the evidence regarding the tower assignment, and Major Rawson is not a defendant.  In Benson's memorandum in opposition, she does not attempt to set forth a basis for a Section 1983 or Title VII retaliation claim in connection with the tower assignment.  (Only Ms. Russell's claim is mentioned in the one paragraph of the brief that addresses retaliation claims.)  Benson does argue in a separate section of the memorandum that she can make a claim of constructive discharge because of the way her FMLA request for leave was handled, but the Amended Complaint does not set forth a claim of constructive discharge or include allegations about mishandling of her leave request.

Defendants made a direct challenge to Ms. Benson's ability to establish a retaliation claim.  She has not met her summary judgment burden by pointing to facts, contested or uncontested, that would establish a Section 1983 or Title VII retaliation claim consistent with the allegations in the Amended Complaint.  Accordingly, Ms. Benson's retaliation claims will be dismissed.

### C. Russel's Claims

Ms. Russell alleges that, about two months after the alleged harassment, she copied a logbook entry for the day of the assault and, despite no known correctional policy against doing so, she was reprimanded and had her shift changed to the north compound, where she would work in close quarters with Wainwright's wife.  Russell adds that her "pay has been withheld in retaliation for her complaints."  ¶ 59.  She alleges that these actions were taken to discourage the constitutionally protected activity of complaining of constitutional violations.  ¶¶ 60-61.

Defendants present evidence in their motion that Ms. Russell was disciplined for violation of a rule that provided, "No copies of any portion of a log book can be made without permission of a Unit Manager or above."  Ms. Russell, in her opposition, admits to making the copy but "takes issue with the write-up because she was engaged in protected activity ... preserving evidence."  In support, she points to a page in her deposition where her counsel asked if she was gathering a copy of the log "in order to preserve evidence to protect your rights?"  Russell answered:

> Pretty much.  I didn't feel like, I honestly, I mean, it was an honest mistake.  I wasn't very familiar with that rule.  And I had, you know, thought since it was my log entry I could make a copy of it.

Counsel for Ms. Russell does not point to any legal authority for the proposition that an employee who has complained of discrimination cannot be disciplined if she violates a rule

that forbids copying her employer's records, even if the employee claims she is gathering evidence to support a lawsuit against the employer.

Defendants have produced a legitimate, non-retaliatory reason for the employment action, and Ms. Russell has not produced any evidence to show that the proffered reason is not true or is a pretext, nor has she established a legal entitlement to gather evidence in violation of workplace rules.  Accordingly, Defendants are entitled to summary judgment with respect this retaliation claim.

Ms. Russell also alleges in her retaliation count that her pay was withheld in retaliation for her complaints.  Defendants point to an explanation in a letter from an attorney for the Secretary of the DOC to counsel for Ms. Russell.  The letter explained that Ms. Russell had requested leave under the FMLA but did not submit a mandated medical certification until several days later, which caused her to be placed in a leave without pay status for a brief time.  There were, according to the explanation, no additional wages due.  Ms. Russell, in her memorandum in opposition, does not address this aspect of her retaliation claim. She has not met her summary judgment burden, and her retaliation claims will be dismissed.

**Conclusion**

Plaintiffs' Motion for Partial Summary Judgment (Doc. 47) is denied.  Defendants' Motion for Summary Judgment (Doc. 45) is granted in part by dismissing all Section 1983 and Title VII retaliation claims asserted by Brandi Russell or Janet Benson.  The motion is denied in all other respects.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 30th day of January, 2012.

MARK L. HORNSBY
UNITED STATES MAGISTRATE JUDGE